**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * COURT NO. |
| **VERSUS** | * JUDGE |
| **$955,189.89 IN BANKS FUNDS IN** | * MAGISTRATE |
| **JD BANK ACCOUNT ENDING** | * |
| **IN 3496** | * |

**VERIFIED COMPLAINT FOR FORFEITURE IN REM**

NOW INTO COURT comes the UNITED STATES OF AMERICA (the "Government")
by and through the United States Attorney for the Western District of Louisiana and the
undersigned Assistant United States Attorney, who brings this Complaint for Forfeiture *in rem* for
the reasons set forth hereafter:

**NATURE OF THE ACTION**

1.      This is an *in rem* civil forfeiture action brought by the United States of America to
forfeit to the United States $955,189.89 in U.S. Currency seized from the JD Bank account ending
in 3496, during the execution of a federal seizure warrant executed on June 24, 2026. The
defendant property consists of or is derived from proceeds obtained by the account holder,
Southwest Durable Medical Equipment & Supplies LLC and/or Roger Lendon Royer II, obtained
directly or indirectly as the result of violations of 18 U.S.C. §§ 1349, 1347, and 1957, and thus is
subject to forfeiture to the United States pursuant to 18 U.S.C. § 982(a)(1).

**JURISDICTION AND VENUE**

2.      The Court has original jurisdiction over this proceeding pursuant to 28 U.S.C.
§1345 as the United States of America is commencing this action.

3.      This Court has *in rem* jurisdiction and venue over this forfeiture action, pursuant to 28 U.S.C. § 1355(b)(1)(A), as the acts giving rise to the forfeiture occurred in the Western District of Louisiana.

4.      Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the Government's claims occurred in the Western District of Louisiana.

5.      Venue is also proper before this Court pursuant to 28 U.S.C. § 1395(b), as the defendant *in rem* was found and seized in the Western District of Louisiana.

6.      The plaintiff in this action is the United States of America.

## DEFENDANT *IN REM*

7.      The Defendant *in rem* of this action consists of $955,189.89 in U.S. Currency (the "Defendant Property").

8.      The Defendant Property remains in the custody of Federal Bureau of Investigation ("FBI").

## BASIS FOR FORFEITURE

8.      On June 24, 2026, the Defendant Property was seized from JD Bank located at 120 Sam Houston Jones Parkway, Lake Charles, Louisiana during the execution of a federal seizure warrant issued by the Court on or about June 23, 2026, and executed by the FBI.

9.      During the execution of the search warrant on June 24, 2026, federal officers seized a cashier's check in the amount of $955,189.89 in U.S. currency ("Seized Funds") from JD Bank, account number ******3496, which is owned by Southwest Durable Medical Equipment & Supplies LLC ("SWDME") and/or Roger Lendon Royer II ("Royer II").

10.     The Seized Funds are believed to be the product of fraudulent activity on the part of SWDME and Royer II, as determined by an FBI and HHS-OIG investigation. Said investigation found SWDME and Royer II in violation of 18 U.S.C. § 1349, conspiracy to commit health care fraud; 18 U.S.C. § 1347, health care fraud; and 18 U.S.C. § 1957, money laundering, stemming from a scheme involving the criminal fraudulent billing for durable medical equipment and depositing the proceeds from such activities, the Seized Funds, in the account that was seized.

*Background on Relevant Criminal Statutes*

11.     The health care fraud statute, 18 U.S.C. § 1347, prohibits knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

12.     The fraud conspiracy statute, 18 U.S.C. § 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. § 1347.

13.     The general conspiracy statute, 18 U.S.C. § 371, prohibits conspiracy to defraud the United States or to purchase, sell, and distribute Medicare beneficiary identification numbers in violation of the Federal Anti-Kickback Statute.

14.     The money laundering statute, 18 U.S.C. § 1957, makes it a federal crime for a person to knowingly engage in, or attempt to engage in, a monetary transaction involving criminally derived property, in excess of $10,000.00, that is derived from specified unlawful

3

activity. The term "specified unlawful activity" includes "any act or activity constituting an offense involving a Federal health care offense[.]" 18 U.S.C. § 1956(c)(7)(F).

15.    Property subject to criminal forfeiture under to 18 U.S.C. § 1349 may be forfeited pursuant to 18 U.S.C. § 982(a)(1). As property subject to criminal forfeiture, the Defendant Property may be seized pursuant to 21 U.S.C. §§ 853(e) and (f) as incorporated by 18 U.S.C. § 982(b)(1).

16.    Property subject to civil forfeiture pursuant to 18 U.S.C. § 1349 may be forfeited pursuant to 18 U.S.C. §§ 981(a)(1)(C) (under a proceeds theory) and 981(a)(1)(A) (under an involved-in/facilitating property theory). As property subject to civil forfeiture, the Defendant Property may be seized pursuant to 18 U.S.C. § 981(b).

17.    Property subject to criminal forfeiture pursuant to 18 U.S.C. § 1347 may be forfeited pursuant to 18 U.S.C. § 982(a)(7). As property subject to criminal forfeiture, the Defendant Property may be seized pursuant to 21 U.S.C. §§ 853(e) and (f) as incorporated by 18 U.S.C. § 982(b)(1).

18.    Property subject to civil forfeiture pursuant to 18 U.S.C. § 1347 may be forfeited pursuant to 18 U.S.C. §§ 981(a)(1)(C) (under a proceeds theory) and 981(a)(1)(A) (under an involved-in/facilitating property theory). As property subject to civil forfeiture, the Defendant Property may be seized pursuant to 18 U.S.C. § 981(b).

19.    Property subject to criminal forfeiture pursuant to 18 U.S.C. § 371 may be forfeited pursuant to 18 U.S.C. § 982(a)(7). As property subject to criminal forfeiture, the Defendant Property may be seized pursuant to 21 U.S.C. §§ 853(e) and (f) as incorporated by 18 U.S.C. § 982(b)(1).

20.     Property subject to civil forfeiture pursuant to 18 U.S.C. § 371 may be forfeited pursuant to 18 U.S.C. §§ 981(a)(1)(C) (under a proceeds theory) and 981(a)(1)(A) (under an involved-in/facilitating property theory). As property subject to civil forfeiture, the Defendant Property may be seized pursuant to 18 U.S.C. § 981(b).

21.     Property subject to criminal forfeiture pursuant to 18 U.S.C. § 1957 may be forfeited pursuant to 18 U.S.C. § 982(a)(1). As property subject to criminal forfeiture, the Defendant Property may be seized pursuant to 21 U.S.C. §§ 853(e) and (f) as incorporated by 18 U.S.C. § 982(b)(1).

22.     Property subject to civil forfeiture pursuant to 18 U.S.C. § 1957 may be forfeited pursuant to 18 U.S.C. §§ 981(a)(1)(C) (under a proceeds theory) and 981(a)(1)(A) (under an involved-in/facilitating property theory). As property subject to civil forfeiture, the Defendant Property may be seized pursuant to 18 U.S.C. § 981(b).

<em>Relevant Individuals and Entities</em>

23.     Roger Lendon Royer II ("Royer II") is a resident of Lake Charles, Louisiana. According to documents associated with the Defendant Property, Royer II is the manager of Gillis Vape and Smoke located at 6191 US 171, Ste. B, Lake Charles, Louisiana 70611.

24.     Southwest Durable Medical Equipment & Supplies LLC ("SWDME") is located at 1416 Thompson Rd., Apt. A, Lake Charles, Louisiana 70611. SWDME was incorporated by Royer II with the Louisiana Secretary of State on December 29, 2025, and the Louisiana Secretary of State lists Royer II as the manager of SWDME.

*Background on the Federal Health Care Program*

25.     The Medicare Program ("Medicare") is a federal health care program that provides free or below-cost health benefits to certain individuals, primarily persons aged 65 years or older or the disabled. Medicare is administered by Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who receive benefits under Medicare are commonly referred to as Medicare "beneficiaries."

26.     Medicare is divided into different programs or "parts." "Part A" covers health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. "Part B" covers physician services and outpatient care, including an individual's access to Durable Medical Equipment ("DME") and wound dressings. "Part C," also known as "Medicare Advantage," provides Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans. Private health insurance companies offering Part C plans are known as Medicare Advantage Organizations ("MAOs"). MAOs are required to provide Medicare beneficiaries with the same services (except hospice care) and supplies offered under other Medicare plans. Health care providers that provide and supply items and services to beneficiaries, whether under Medicare Part A, B, or C, are referred to as "providers." Medicare beneficiaries enrolled with an MAO are sometimes referred to as a "member" of the particular MAO.

27.     MAOs, including Humana, United Healthcare/Optum, Aetna, and others, contract with CMS to provide managed care to Medicare beneficiaries. In Medicare Advantage, the Government pays each MAO's monthly fixed, capitated (per beneficiary) amount, adjusted by the expected risk of each beneficiary; in-turn, the MAOs provide health care benefits to the

beneficiaries. As such, these companies are "health care benefit programs," as defined by 18 U.S.C. § 24(b).

28.    MAOs often make payments directly to providers, rather than to the Medicare beneficiaries that receive the health care benefits, items, and services. To obtain payment for services or treatment provided to a beneficiary enrolled in a Medicare Advantage plan, providers submit itemized claim forms to the MAO (i.e., Humana, United Healthcare/Optum, Aetna, etc.) certifying that the contents of the form are true, correct, and complete, and that the form was prepared in compliance with the laws and regulations governing Medicare. The provider also certifies that the services being billed were medically necessary and were in fact provided as billed. The claim forms are typically submitted electronically.

### *Durable Medical Equipment ("DME")*

29.    The HHS-OIG and FBI investigation concerns claims submitted to Medicare Part C for various DME, including four orthotics which are identified in the Humana Claims data as Healthcare Common Procedure Coding System ("HCPCS") L0636 (back brace), L3971 (shoulder-elbow-wrist brace), L3973 (shoulder-elbow-wrist brace), and L2005 (knee-ankle-foot). The HHH-OIG and FBI discovered that certain members were billed for one back brace, two shoulder elbow-wrist braces, and two knee-ankle-foot braces, totaling 5 claims for each member.

30.    The Social Security Act, Title 42, United States Code, Section 1395y(a)(1)(A) states that no Medicare payment shall be made for items or services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of malformed body member." As a condition of Medicare payment, a physician or other Medicare

7

provider must certify that the services performed, or items prescribed, were medically necessary. 42 U.S.C. § 1395n(a)(2)(B).

31.     Medicare properly reimburses claims for the provision of durable medical equipment ("DME") only if the equipment is ordered by a provider, is reasonable and medically necessary for the treatment of a diagnosed and covered condition and is actually provided to beneficiaries.

31.     Medicare does not reimburse providers for claims that are procured through the payment of kickbacks and bribes.

32.     Additionally, Medicare Administrative Contractors ("MACs") issue Local Coverage Determinations ("LCDs") regarding coverage policies in each jurisdiction. In Louisiana, CGS is the MAC responsible for issuing LCDs.

33.     Specifically, LCD L33686, addressing ankle-foot, knee-ankle-foot orthotics, provides, "Knee-ankle-foot orthoses described by codes L2000, L2005, [and other HCPCS] are covered for ambulatory beneficiaries whom ankle-foot orthosis is covered and for whom additional knee stability is required. If the basic coverage criteria for ankle-foot orthoses or knee-ankle-foot orthoses are not met, the orthosis will be denied as not reasonable and necessary.

34.     LCD 33686 continues, "A standard written order must be communicated to the supplier before a claim is submitted. If the supplier bills for an item addressed in this policy without first received a completed standard written order, the claim shall be denied as not reasonable and necessary."

35. Further, Medicare coverage for the ordering of orthotics falls under the same general requirement that such items must be medically necessary for diagnosis or treatment of an injury or illness. See 42 U.S.C. § 1395y(a)(1)(A).

36. The Healthcare Common Procedure Coding System ("HCPCS") Modifiers include LT which indicates left side, RT which indicates right side, and KX which indicates requirements specified in the medical policy have been met. Every single encounter/claim submitted by SWDME to Humana had the modifier KX.

37. DME suppliers, such as SWDME, are required by Medicare to maintain documentation in their files, such as medical records and proof of delivery of the supplies, for a period of seven years.

38. To bill Medicare or a Medicare Advantage plan, a DME supplier is required to obtain a National Provider Identifier ("NPI") number through the National Plan and Provider Enumeration System ("NPPES"). This application is typically completed through the official U.S. government website, https://nppes.cms.hhs.gov. Upon approval, a provider acquires a unique, 10-digit NPl.  After an NPl is provided, NPPES publicly publishes certain parts of the NPl record to include the provider's name, specialty, taxonomy, and practice address.

39. DME suppliers must meet certain quality standards to bill Medicare Part B. These include requirements for leadership and administration, financial and human resources management, consumer services, performance monitoring, product safety, and secure information handling. Suppliers must demonstrate compliance with Medicare laws, maintain a physical location, employ qualified personnel, ensure product safety, and implement systems to prevent fraud, waste, and abuse. Because these standards are rigorous and subject to accreditation,

9

fraudulent DME suppliers often fail to meet them and are therefore unable to bill Medicare Part B. However, these same providers may still exploit loopholes by submitting out-of-network claims to MAOs, which may not always provide the same level of oversight. Upon information and belief, some individuals committing health care fraud may avoid billing Medicare Part B, and target MAOs.

*FBI Investigation Background*

40.    Since May 2026, the FBI has been investigating, jointly with the U.S. Department of Health and Human Services Office of Inspector General (HHS-OIG), Royer II, SWDME, and others, for suspected violations of the healthcare fraud and related money laundering crimes. Specifically, Royer II, SWDME, and others, are suspected of fraudulently billing Medicare Part C, to include Humana Advantage (an "MAO"), members for approximately $7 million in DME that were either not ordered by a physician or not received by the member between January 2026 and the present.

41.    Royer II (DOB: 03/01/1999) is a resident of Lake Charles, Louisiana, a census-designated place in Beauregard Parish, which is located within the Western District of Louisiana. According to records obtained from JD Bank and associated with SWDME, Royer II lists his occupation as a manager of "Gillis Vape & Smoke," which is located at 6191 N Highway, Lake Charles, Louisiana 70611. According to the NPPES NPl Registry Database, Royer II is listed as the owner of SWDME.

42.    SWDME is a DME company owned or managed by Royer II. This is reflected in records maintained by NPPES NPl Registry website.  The Secretary of State website for Louisiana similarly lists "ROGER ROYER II" as the sole Manager and Member.

43.     According to NPPES records, beginning on or about December 29, 2025, Royer II established a network of companies and obtained NPls for those companies. Currently, the FBI is aware of at least three companies affiliated with Royer II, all of which have a mailing address located in the Western District of Louisiana: Southwest Durable Medical Equipment & Supplies LLC (physically located in Lake Charles, Louisiana), Northern Durable Medical Equipment & Supplies LLC (physically located in Milwaukee, Wisconsin), and Southern Medical Equipment & Supplies LLC (physically located in Houston, Texas).

44.     According to NPPES records, the NPI creation, application, and submission for the three Royer II-controlled companies all have internet protocol ("IP") addresses that are associated with the city of Karachi, State of Sindh, in the Country of Pakistan. The username used for all the logins to NPPES is "rogerlendon."

45.     The HHS-OIG and FBI reviewed the Humana MAO encounter data as part of its investigation. According to MAO encounter data, the Royer II-controlled entities have billed Humana MAO from January 2026 to March 2026 as follows for DME:

Southwest Durable Medical Equipment & Supplies LLC:        $2,352,000.00

Northern Medical Equipment & Supplies LLC ("Northern"):        $2,352,000.00

Southern Medical Equipment & Supplies LLC ("Southern"):        $2,400.000.00

Total:        $7,104.000.00

46.     Humana MAO encounter data show that all three Royer II-controlled entities, identified in the table above, began submitting high volumes of claims shortly after the companies were registered with the respective Secretaries of State. And for two of the DME companies, the purported "dates of service" for the encounters occurred before the companies were even

registered. In addition, most members/beneficiaries were all billed for the same five (5) orthotics: one back brace, two knee-ankle-foot braces, and two shoulder-elbow-wrist braces. Purported dates of service range from January 5, 2026, to March 27, 2026, with many members located in Illinois or Georgia. All the referring providers, who purportedly ordered the DME, are located and practice in Texas. According to the Humana MAO encounter data, SWDME billed 95 unique members, Northern billed 97 unique members, and Southern billed 96 unique members.

47.     Humana MAO paper checks issued because of the DME claims submitted by the three Royer II-controlled entities were all mailed to the same address: 6191 N Hwy 171, Lake Charles, Louisiana 70611. The total amount paid to the three Royer II-controlled entities is $2,089,676.16. The checks written out to Northern and Southern were found at Royer II's apartment during a premises search warrant executed by FBI and HHS-OIG on May 22, 2026, and are now in the possession of the FBI.

48.     United Healthcare/Optum MAO was also billed by SWDME for 99 encounters/claims on 94 total members from dates of service ranging from January 5, 2026, through January 30, 2026. In connection with the claims, SWDME billed Optum $2,376,000 for the DME related to the claims. Optum investigated SWDME and conducted phone interviews with four physicians' offices and with four members. The physicians' offices confirmed that the members who were billed for DME items were not patients of the physicians; therefore, the physicians were not "referring providers" as represented by SWDME. The four members interviewed by Optum stated that they neither requested nor received orthotic braces.

49.     On March 12, 2026, a Special Investigator with Optum called the phone number associated with SWDME (661-554-9745), and an individual named "Tim" answered the call. Tim

had a heavy accent and was at times difficult to understand. Tim confirmed the physical address of the DME company: 6191 N Hwy 171, Lake Charles, Louisiana 70611. Also, Tim mentioned that the DME company had two "teams": one which handled the billing, and the Optum Special Investigator could not make out the other because of Tim's accent. Tim stated that the business kept standard hours: 9:00am to 5:00pm, Monday through Friday. The Optum Special Investigator asked specific questions of Tim, such as who fits the members/beneficiaries for the DME and how the DME is sent to them. Tim's answers were confusing and shifted subjects, and he claimed that the members/beneficiaries' primary care physicians fitted the DME.

50.    To date, the FBI and HHS-OIG's investigation has focused on SWDME, a durable medical equipment company registered in Lake Charles, Louisiana, within the Western District of Louisiana. Of the three companies apparently involved in the scheme, SWDME is the only entity with a physical address in Louisiana. On April 30, 2026, surveillance was conducted by the FBI and HHS-OIG at the mailing address where the Humana MAO paper checks were mailed (6191 N Hwy 171, Lake Charles, Louisiana 70611) for all three DME companies controlled by Royer II. An Exxon gas station with a food mart, vape shop, and casino are the only businesses that appear to operate at the location (The three businesses located within the one building are a Gillis Food Mart, a Gillis Vape and Smoke, and Buddy's Casino).

51.    According to both the Louisiana Secretary of State and the NPPES NPI Registry, SWDME is physically located at 1416 Thompson Road, Apt. A, Lake Charles, Louisiana 70611.

53.    Royer II used his vehicle to deposit checks into JD Bank (Account No. ******3496) written out to SWDME by Humana for the fraudulent DME claims. Royer II made

these deposits with JD Bank on April 28, 2026, May 4, 2026, and May 6, 2026. On April 28, 2026, and May 4, 2026, Royer II made these deposits inside the branch location.

54.     JD Bank security footage on two separate occasions, May 4, 2026, and May 6, 2026, shows Royer II making deposits of multiple checks from Humana for fraudulent DME orders into the Defendant Property. Royer II deposited $901,114.07 into the JD Bank account on May 4, 2026. Royer II deposited a $31,342.08 check from Humana into the JD Bank account on May 6, 2026.

55.     Additionally, user logs for JD Bank Mobile App show that an individual accessed the app using the IP address of 207.201.244.106 (location Sulphur, Louisiana) and added the phone number 337-707-4535 for authentication. This occurred on April 28, 2026, the same date that Royer II deposited two checks into the Defendant Property from Humana made payable to SWDME and totaling $22,723.81. The individual accessing the JD Bank Mobile App using the IP address of 207.201.244.106 is also associated with the username "iamlendon." Again, ROYER II's full name is "Roger Lendon Royer II."

56.     The FBI confirmed the deposits into the Defendant Property described herein by reviewing the records pertaining to it.

57.     On May 15, 2026, during a surveillance operation, the FBI observed Royer II drive to and enter the JD Bank branch located at 120 Sam Houston Jones Parkway, Lake Charles, Louisiana, at approximately 10:39 AM CST. During continued surveillance operations, Royer II departed the branch location in his vehicle and returned to his apartment residence located at 1416 Thompson Road, Apt. A, Lake Charles, Louisiana 70611, which is the purported physical location of SWDME. Also on May 15, 2026, the FBI interviewed a Bank Security Officer at JD Bank who

had spoken with Royer II when he visited the branch location on the same day. The Bank Security Officer stated that Royer II had questioned why the MAO deposits had been placed on a freeze and when the money would be released. During the conversation with the Bank Security Officer, Royer II stated that he had called Humana and confirmed the checks were legitimate and should clear. Royer II also stated that his company's billing department was receiving calls and had invoices to pay, and Royer II claimed that he had his own bills to pay.

58.     The FBI interviewed Part C members who indicated that they had never received any DME. Agents also interviewed providers, who indicated that they did not order the DME. SWDME, Northern, and Southern billed the MAOs for services never rendered.

59.     Regarding the Part C members, the HHS-OIG and FBI interviewed three (3) members (including one (1) husband of a member and one (1) daughter of a member), all of whom indicated that the members never received any DME, did not know the referring provider referenced in the claims data, and did not know the name of the DME company associated with Royer II.

### *Member V.M.*

60.     Member V.M. is a Humana Part C member who resides in Joliet, Illinois. V.M.'s husband confirmed that V.M. had not received any back or knee braces and had only received one (1) ankle brace that had been prescribed by a local physician. According to the claims data submitted by Southern Medical Equipment & Supplies LLC ("Southern"), R.P. was the referring provider who prescribed DME to V.M. The FBI learned that R.P. is located in, and practices medicine out of, Texas. V.M.'s husband was not familiar with R.P.'s name, and V.M.'s husband was not familiar with Southern. According to Humana Part C Medicare claims data, V.M.'s plan

was billed for $24,000 for five (5) individual claims related to DME submitted by Southern. Humana paid $13,874.92 for the DME.

### *Member J.W.*

61.    Member J.W. is a Humana Part C member who resides in Tucker, Georgia. J.W. confirmed that they neither received nor needed any DME. According to the claims data submitted by Northern Medical Equipment & Supplies LLC ("Northern"), M.U. was the referring provider who prescribed DME to J.W. Through research, the FBI learned that M.U. is located in, and practices medicine out of, Texas. J.W. did not recognize the name of referring provider M.U. and had never heard of Northern. According to Humana Part C Medicare claims data provided by Humana, J.W.'s plan was billed for $24,000 for five (5) individual claims related to DME submitted by Northern; Humana paid $1,748.84 for the DME.

### *Member S.W.*

62.    Member S.W. is a Humana Part C member who resides in Jonesboro, Georgia. The FBI spoke with S.W.'s daughter, T.W., who confirmed that S.W. never requested or received any DME. During the conversation, the FBI learned that T.W. answers all calls for S.W. and makes all medical decisions. According to the claims data submitted by Southern, M.L was the referring provider who prescribed DME to S.W. Through research, Agents learned that M.L is located in, and practices medicine out of, Texas. T.W. did not recognize the name of referring provider M.L and did not recognize the name of Southern. According to Humana Part C Medicare claims data provided by Humana, S.W.'s plan was billed for $24,000 for five (5) individual claims related to DME submitted by Southern; Humana denied all of the claims.

*Provider M.D. and Provider M.I.*

63.     The FBI interviewed provider M.D., whose NPl was listed as the referring provider for 102 unique members on the Humana claims data for the three DME companies associated with Royer II. The total amount billed under provider M.D.'s NPl by the three DME companies is $2,448,000.00 out of which Humana paid $939,340.59. Provider M.D. stated that he has practiced rheumatology since 2017 and had never prescribed or ordered any DME, including orthotics such as back braces.

64.     The FBI also interviewed provider M.L, whose NPl was listed as the referring provider for 54 unique members on the Humana claims data for the three DME companies associated with Royer II. The total amount billed under provider M.L.'s NPl by the three DME companies is $1,392,000.00 out of which Humana paid $169,485.30.  Provider M.L stated that, as a family practice specialist, he rarely orders DME, but he had never ordered any orthotics such as back braces or knee braces.

65.     The HHS-OIG and FBI created the info below using Humana claims data. The data shows five (5) providers associated with CLS Health Network in Texas, all of whom allegedly prescribed DME for Medicare beneficiaries claimed by Royer II-associated entities. All five (5) of these providers denied having ordered the DME. The table shows the number of unique members billed, amount billed, and amount paid for the five (5) referring providers whose NPls were used by the three DME companies associated with Royer II.

| Referring Provider Name | Unique Members | Amount Billed | Amount Paid |
| --- | --- | --- | --- |
| Candice Burnette | 17 | $408,000.00 | $113,119.43 |
| Anil Warrier | 17 | $408,000.00 | $141,925.47 |

| | | | |
|---|---|---|---|
| Regina Pillai | 20 | $480,000.00 | $159,498.93 |
| Motaz Ibrahim | 54 | $1,392,000.00 | $169,485.30 |
| Mohammad Ursani | 102 | $2,448,000.00 | $939,340.59 |

66.     Humana provided data showing that it wrote twenty-four (24) checks to SWDME, Northern, and Southern in mid-to-late April 2026. Humana issued these checks in response to claims submitted by the three (3) Royer II-controlled entities. The checks were mailed to either 6191 N Hwy 171, Lake Charles, Louisiana 70611 or 6191 N Hwy 171, Ste B, Lake Charles, Louisiana 70611.

67.     To date, the FBI investigation has not revealed any business accounts associated with Northern or Southern. Also, according to Bank Security Officers, none of the checks mailed by Humana to Northern or Southern at 6191 N Hwy 171, Lake Charles, Louisiana 70611 have been deposited. In addition, Bank Security Officers confirmed that the check written out to SWDME in the amount of $12,547.84 with the check number of 14875 has not been negotiated as of May 26, 2026.

68.     Royer II was interviewed by the FBI during the execution of a search warrant on his residence on May 22, 2026, and he voluntarily told the FBI that he was instructed to set up the three DME companies by the following individuals: Basharat Afsar, Hassan Naveed, Maq Ahmad, and Ahsan Qureshi. The conversations had with these individuals were primarily through WhatsApp, an encrypted messaging platform. Basharat Afsar is the manager of Gillis Food Mart located at 6191 US 171, Lake Charles, Louisiana 70611. Hassan Naveed is purportedly located in London, United Kingdom. Maq Ahmad and Ahsan Qureshi are purportedly located in Pakistan. Royer II was told that everything about the DME companies was legitimate and that the submission

of billing and the calls being made to the MAO members were being done by the individuals located in London and Pakistan. However, once the funds in Defendant Property were frozen by JD Bank, Royer II thought something was "off" about the situation. Royer II told Affiant that he did not deposit the remaining checks written out to Northern and Southern due to JD Bank freezing the funds for checks written out to SWDME.

69. Based on HHS-OIG and FBI training and experience, this billing pattern, combined with a trend of Medicare beneficiaries reporting not receiving products billed, is consistent with other fraudulent "bust-out" schemes, *i.e.,* schemes where fraudulent providers illegally obtain beneficiary lists and personal information to submit fraudulent claims to MAOs for large amounts in a short period of time hoping to get paid as much as possible before the MAOs catch on.

70. Based on HHS-OIG and FBI training, experience, and investigation, it is highly unusual, and a significant red flag of fraud, for an individual to be associated with numerous DME companies that were rapidly created, submit a high volume of claims to insurance companies in a relatively short amount of time, and lack physical storefronts. This activity appears to follow a pattern in which large volumes of claims are submitted through multiple entities to avoid detection.

71. On or about January 30, 2026, the JD Bank account was opened. The signature card for the account is dated January 30, 2026, and lists Royer II as holding signature authority on the account.

72. An analysis of the account activities from December 2025 through May 2026 reveals deposits of $955,179.96 from multiple checks written out to SWDME from Humana, of which 100% were proceeds from the commission of this Medicare fraud scheme. The proceeds from the criminal activity were deposited into the JD Bank account via checks written by Humana

and mailed to SWDME at 6191 US 171, Lake Charles, Louisiana 70611. The other checks written out to Northern and Southern are in the possession of the investigative team as evidence.

73.    The Seized Funds remain in the custody of the Government.

## VIOLATIONS OF 18 U.S.C. § 1347,

## 18 U.S.C. § 1349, 18 U.S.C. § 371 AND 18 U.S.C. § 1957

74.    The health care fraud statute, 18 U.S.C. § 1347, prohibits knowingly and willfully executing, or attempting to execute, a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

75.    The fraud conspiracy statute, 18 U.S.C. § 1349, provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. § 1347.

76.    The general conspiracy statute, 18 U.S.C. § 371, prohibits conspiracy to defraud the United States or to purchase, sell, and distribute Medicare beneficiary identification numbers in violation of the Federal Anti-Kickback Statute.

77.    The money laundering statute, 18 U.S.C. § 1957, makes it a federal crime for a person to knowingly engage in, or attempt to engage in, a monetary transaction involving criminally derived property, in excess of $10,000.00, that is derived from specified unlawful activity. The term "specified unlawful activity" includes "any act or activity constituting an offense involving a Federal health care offense[.]" 18 U.S.C. § 1956(c)(7)(F).

## CLAIM FOR RELIEF

78.     Based upon the foregoing facts and the applicable law, the Defendant Property is forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) as "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [. . .] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."  18 USC § 1956(7)(F) specifically includes the Defendant Property is subject to forfeiture as the proceeds resulting from "any act or activity constituting an offense involving a federal health care offense"

## CONCLUSION AND RELIEF

Plaintiff, the United States of America, requests that a warrant be issued for the arrest and continued seizure of the Defendant Property; that due notice be given to all interested persons to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendant Property be condemned and forfeited to the United States for disposition according to law; and that the United States be granted such other further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

ZACHARY A. KELLER
United States Attorney

Dated: August 4, 2026,

*/s/ Aaron Beyt*
AARON BEYT (LA Bar 32827)
Assistant United States Attorney
800 Lafayette Street, Suite 2200
Lafayette, Louisiana 70501
Phone: 337-262-6618
Email: aaron.beyt@usdoj.gov

**VERIFICATION**

I, Nicholas Kastenholz, state that I am a Special Agent in the Federal Bureau of Investigation ("FBI") in Lake Charles, Louisiana. I have read the foregoing Complaint for Forfeiture and declare under penalty of perjury that the facts contained therein are true and correct based upon knowledge possessed by me or upon information received from other law enforcement agents.

*Nicholas Kastenholz*
_____
Nicholas Kastenholz, Special Agent
Federal Bureau of Investigation

Dated: July  30 , 2026